Good morning, your honors, and may it please the court, Christopher Podolsky on behalf of the appellant, Antonio Gonzalez. If I may, I'd like to request two minutes of rebuttal time. Please keep track of it. Thank you, your honor. Mr. Gonzalez's conviction must be reversed for two reasons. One, he was not free from official restraint as he attempted the illegal reentry, and therefore his acts could not have constituted the underlying crime of illegal reentry. Two, the Border Patrol agent was required to Mirandize Gonzalez prior to eliciting incriminating field statements because Gonzalez was not free to leave and the agent questioning constituted interrogation. First, Gonzalez was found guilty of attempting to commit a crime that could not have been committed. It's well established in this circuit that an alien cannot illegally reenter the United States unless he has done so free from official restraint. And your argument is directly contrary to Leos Maldonado. Is that right? Your honor, Leos Maldonado is both factually and legally distinguishable. I think there are grounds upon which this Court can distinguish it. To the extent that it conflicts with my argument, I believe that that holding is inconsistent with Gracias Ulibarri and Enbanque's decision of this Court. If I may attempt to factually distinguish that case, there the Court assumed without deciding that Leos Maldonado was under surveillance. And the factual summary in that opinion specifically said that he was spotted by surveillance cameras after he was already in the United States. Of course, in this case, it was throughout and at the time that he was on the fence. Moreover, the alien there was not under restraint. There's evidence, there's a factual finding in that opinion that says that the alien was found in a place that he could hide from the view of immigration trucks. Both of those facts suggest that he was under surveillance. But you just said they assumed that he was under surveillance. So the facts don't matter. It doesn't, Your Honor. I was just making the point that I think that there were – there are factual grounds. Importantly, the legal grounds, I think, are the primary argument, the primary distinguishing factor. In that case, the Court didn't focus on the issue that we – that Mr. Gonzales raised in this case. The Court considered in that case whether the substantial step itself would have been impossible – legally impossible, not whether the substantial step, if taken, would have committed a crime that was legally possible. And I think that's a critical distinction. The Court in Leos Maldonado focused instead on whether it was impossible to take that step. And if I can point to a quote from that opinion just to emphasize the point. The Court there said, quote, The mere fact that an alien is under official restraint does not make substantial steps toward entry impossible. And that gets to my point that the Court there asked a very different question than the question that we're asking the Court to resolve in this case, which is if those substantial steps are taken, the question isn't whether they're impossible. The question is whether those steps, if taken, result in a crime that's possible, an offense that's possible. But I thought that the general law of attempt was that you can have – you can make an attempt to do something that's factually impossible. The question is not – we're not arguing factual impossibility. Or legally impossible. I don't think that's right, Your Honor. I think that the common law of attempt defines legal impossibility as negating fully the crime of attempt. The last example is the bank robbery example where a defendant takes – I'm sorry, a criminal takes action in preparation for committing the crime. If, in fact, the bank is having a free get money while you can day, you can come and get all the money you want. That would make the crime legally impossible. And factually impossible, I guess, for different reasons. But the critical inquiry here is that it's legally impossible to commit a crime under this circuit's precedent when an alien is under constant surveillance and is not free from official restraint. Have you seen the recent Hernandez-Cruz case in that regard? I'm sorry, Your Honor. What was the name of that case? Hernandez-Cruz v. Holder. I do not believe so, Your Honor. I'm happy to address the finding. I did not see that in my preparation for it. You've used half of your eight minutes already. Do you want to spend the other half on Miranda? Absolutely. The field statements given by Mr. Gonzalez regarding alienage should have been suppressed because he was not Mirandized after being deprived of his freedom of action and subject to interrogation. The statements were made while he was deprived of a freedom of action. A reasonable person in Gonzalez's position would have felt deprived in a significant way such that he was not free to terminate the interrogation and leave. I find the law in this area so confusing because in the traffic stop cases, and to a degree it applies to Terry cases, and it says that those people are not in custody, they're certainly not free to leave. So how can free to leave be the standard? Well, Your Honor, that's the standard that the Supreme Court articulated. Well, sometimes, some of the time, but not others of the time. Well, all the time. The Miranda rights are, the question of Miranda. But what about the traffic stop and Terry stop cases? Those people are not free to leave, but in many circumstances they're not in custody. Well, I believe the question there is different because although the officers are effecting a stop, I believe that the defendant or the suspects in those cases may be free to leave. You mean that if a policeman stops me for a traffic stop and I say I'm out of here, that's okay? Of course it's not. It depends on the factual circumstances in the case. I agree with Your Honor that it's confusing. The Fourth Amendment search and seizure jurisprudence is very – there's a gray area there between that and the Miranda overlap under the Fifth Amendment. And I think that the critical way of dealing with that difficult issue is to distinguish it entirely on factual grounds from our situation because this Court's jurisprudence over the Terry traffic stops is a very different factual scenario from the facts that we have in this case. But our case law, and particularly at the border, also seems with regard to not only traffic stops but Terry stops, even when the suspicion is that the person is an illegal alien in Cervantes' case, to say that you're not a Miranda customer. Now, I don't understand it, but that's the case law. Well, again, I think that those cases are true for true Terry stops. This is not a Terry stop in this case, Judge Berzon. The reason why is because in those cases, the aliens, suspected aliens, were already over the border and well into the United States. And the case of Cervantes 4 is the one that the district court relied upon. The alien was walking along the highway already in the United States, and the officer saw him, and as soon as he saw the officer, he ran. So the way you're distinguishing Cervantes is that in Cervantes, you didn't see the person come across the border, so you didn't necessarily know what had happened. He was trying to find out, the officer. Absolutely. Whereas in this case, you saw him come across the border, you knew from the get-go what it was all about. Absolutely. That's exactly the argument. And the Terry cases are, there's another one as well, I believe, that the government relies upon. It was Galindo-Galejos. And, again, that's one where the alien was 1,800 feet north of the border. And actually, no, there were multiple aliens in that case, 1,800 feet over the border. The crime had already been committed. And so in this case, the border patrol officer had seen Mr. Gonzalez,  or saw him climb down onto the U.S. fence and take off running. Far different scenario. So the difference is that there was probable cause here, or the difference is that the border search rules play differently, or exactly what? We make the argument, the former argument, Your Honor, that this rose to the level of probable cause because of the circumstances of the case. Probable cause isn't enough to make a Terry stop invalid. I think what Judge Canelli asked is a little more than probable cause. He said if you observe the crime itself being committed, rather than a suspicious circumstance of somebody running away from the border, if you see the entry, at least that's what I understood your argument was. That's a great argument, too, Your Honor. That was the only one I could conceive of. Yeah, that's correct, Your Honor. We like that argument. And the border cases, the case of the Terry stop cases, can be differentiated on the grounds, on that ground, but also on the fact that the aliens were already over in the United States. And so when there's reasonable suspicion after the crime has been committed, then there is a sufficient Terry stop. We agree with those holdings. A ruling in Mr. Gonzalez's favor in no way jeopardizes those Terry cases, which are factually distinguishable for the reasons that Judge Reinhart just mentioned. I see I have a minute left. I'd like to reserve my time. That's what Judge Canelli was saying. And Judge Canelli, Your Honor. Thank you. I'll take that. May it please the Court. My name is Larry Spalding. I'm representing the United States in this case. This is not a case of legal impossibility. It's factual impossibility. Factual impossibility is a situation where, unknown to the defendant, the consummation of the crime is physically impossible. That's what happened here. Unknown to him, he couldn't actually enter. It was physically impossible for him to enter because of the official restraint doctrine, that is, he's under surveillance. So this is, and admittedly, this distinction between legal and factual impossibility, and there are cases that call into question whether it's even a defense in any, but in any event, this is a factual impossibility. But this Court has already dealt with this issue in Leo Smaldonado, and Leo Smaldonado is not in conflict with Garcetis Ulibarri. In Ulibarri, the Court there said two of the five elements that are, that are relevant here. Defendant had the conscious enter, conscious desire to enter without consent, and he committed an overt act that was a substantial step towards entering without permission. That's the thing. Not entering without surveillance. It's entering without permission, and that's the crime here. He certainly intended to enter. He didn't intend to enter where there would be some surveillance on him. That certainly is not the case. He intended to enter free of surveillance. And frankly, it turns the whole argument on its head. It leads to the absurd result that the government is required to prove an attempt where there's surveillance because of the official restraint doctrine, and then it's impossible to prove that he attempted because of the official restraint doctrine. That result just can't be the case. So I would submit that this argument that there's a legal impossibility, number one, it's incorrect. Number two, this Court's already ruled. And number three, it's just nonsense, the result. In terms of the issue, the Miranda issue, this was a Terry type field interview. There's no doubt the person is seized in that situation, but he's not in custody for Miranda purposes. And I know the law is all around this, and it's often very confusing. But I think the way to think of it is when you are seized in a Terry type stop, you're not free to leave. In other words, the officer can hold you, but a reasonably innocent person would feel free to leave knowing that once he dispels the officer's suspicion, he would then be free to leave. Wait a second. So what happened here, at least what the record indicates or suggests, is that the officer saw the defendant climb in the fence and coming down the other side and then chased him for a period of time, chased him constantly, and then basically cornered him behind a garbage can. That's not what most people would call a Terry stop. I mean, what happened in Cervantes, which is a case we were talking about before, is more like what you'd normally consider a Terry stop. A person sees a person acting in some way, an officer sees somebody who's acting in some way suspiciously, wants to find out what's going on, so he questions him. That's not what we're talking about here. We're talking about a police chase. After he saw him commit what appeared to be the crime and then he cornered him. How is that a Terry stop? Well, for a couple of reasons. Number one, let's assume, first of all, that he did actually see him come across, he had probable cause. This court has made very clear, it's not the strength of the suspicion, but the nature of the interrogation. I'm not talking about the strength of the suspicion. I'm talking about the objective circumstances of what happened. The guy clearly saw that he was seen, otherwise he wouldn't have run off. Okay? And then he sees that he's being chased, otherwise he wouldn't have hidden behind the garbage can. So those are all objective circumstances. It's not subjective about what's in the officer's head. Well, the officer doesn't know if he's a citizen yet or not. That's for sure. Yeah, most citizens don't scale fences. Right, but he doesn't know that. And second, it's not clear he was. He may never know. I mean, you can take him to jail, put him there, and then he went to case yesterday. The man still doesn't know whether he's a citizen. Well, that's certainly the case. But what we're talking about is, does he suspect at this point? It's what his reasonable suspicion was at that point. Now, it's not clear that he was under surveillance all the time. In fact, I think the testimony is that when he parked his car, the person had hopped the fence, and he, the officer, then had to hop two fences to then find this person. So he still had to be sure this was the person he had seen cross over. I notice you don't cite Cervantes Torres in your brief. Is there a reason for that? I didn't cite it only because, first of all, Brignoni-Ponce makes it very clear that where there's reasonable suspicion to believe an alien has entered, you can ask citizenship and immigration-related questions. And then Galindo-Gallegos. Wasn't that a checkpoint type thing? Yes, yes. But that makes clear that when there's reasonable suspicion, then Galindo-Gallegos is the leading case from this circuit. Cervantes is, I didn't cite it only because it's a case where the person was on the highway, and he ran away. Right. So he wasn't just walking down the street. It wasn't just that he was walking down the highway. Right. Right. He saw a marked border patrol agent. And he ran. And ran into the desert, and the agent chased him for three-quarters of a mile. So, but even in that situation, I mean, he, you know, is the case stronger here? It's stronger here. But still, that doesn't mean the officer doesn't have the right to ask those questions. So what is it that you would say differentiates this? If you're saying it's not the level of suspicion, that matters. So what matters? What makes this a non-custody, quote, Terry situation versus a custody? I mean, you're not suggesting that you can't have somebody in custody who's not in a police station or an interrogation spot, right? No, no, no. Absolutely not. No. He was in custody. As soon as he answered those questions, the officer made clear. I searched him in. I handcuffed him and searched him into arrest. He was in custody at that point. But in some of the cases, they handcuffed him first and then asked him questions. They still said it was a Terry stop.   And it can be. So what's the line? The line. And it can't be free to leave for the reasons we were saying before. So what is it? The line is if a reasonably innocent person, knowing his innocence and knowing if he answers the questions honestly, would then feel free to leave, that's the Terry type situation. You mean an innocent person hiding behind a garbage can? An innocent person hiding behind a garbage can would know he's free to leave as soon as he told him, I like hiding behind garbage cans. I mean, you know, he did lose this person for a second, so he doesn't know why that person's there. That standard doesn't really make a lot of sense either. If you bring somebody into a police station and you ask them questions, I mean, a reasonably innocent person might think that he'd satisfy them and be free to leave, but they might not believe him and he might not be free to leave. So I don't understand where that goes. Well, all I can say is that's the case law. If someone brought me into a police station and accused me of, you know, murdering you, I'd say, oh, well, they're going to let me out real soon because I'm going to prove to them that it didn't happen, so I can probably get out of there in five minutes, so therefore I'm not in custody. If you came in on your own. I'm not saying that. This guy did not go up to the police. So it's not like he instigated himself. But if somebody came up to me and took me to a police car and said, you know, I'm going to talk to you, I'm putting you in a police car and you're under arrest and we think you murdered somebody, I say, ho, ho, ho, that's ridiculous. Obviously I'm going to prove to them in five minutes I expect to be out of here. That's the end of it. There's no feasible line that I can see. Well, I guess if they say you're under arrest, then you're under arrest. And if they don't say you're under arrest. Part of it depends on, for example, if they confront you with the evidence. Once they start down that road, then they say now the nature of the interrogation has changed and now we're talking about custody. All right. But that's a useful point. And if that's true, then why isn't this the equivalent? And I guess this is what Judge Connelly is saying, essentially. This guy knows that they are stopping him basically at the border. And, in fact, they knew. I mean, they were essentially confronting him with the evidence because they were right there. And they had every reason to be certain that he had crossed the border and he had every reason to know that. So why isn't that the same as confronting him with the evidence? Because he wasn't confronted with evidence. He was asked, are you a citizen? All right. So instead they had said, we just saw you cross the border. Are you a citizen? Well, first of all, we're all assuming that he was under he was always seen. He wasn't. He crossed this fence and was out of sight. When you look at pages of the supplemental excerpts of record, 37, 39. We don't believe that you just crossed the border. We have the following reasons to think you crossed the border. Right. Are you a citizen?  That would be different. He again, I would just say no. The agent where he has reasonable suspicion to believe always can ask those questions. But Judge Berzon's question is if there's some level of suggesting to the person that we've got something on you. In other words, wasn't that you that just climbed the fence over there? In other words, if this officer had said that, wasn't that you just climbed the fence over there? Are you a citizen? Would that initial statement have been enough to convert this from a Terry stop to something other than a Terry stop? I don't know, but then we are going down that road. That's for sure. We're going down that road where they're being confronted with evidence. But that's just not the case here. Let me ask you something. Is the government's position that if it's a Terry stop, then it's not a Miranda problem? Correct. In other words, just a direct translation from a Fourth Amendment concept to a Fifth Amendment concept. So we just say was it a Terry stop? I mean, there are Terry stop cases in which people are handcuffed at gunpoint and put in police cars, and people say it's a Terry stop for Fourth Amendment purposes, and you'd say that it's on custody for Miranda purposes just because it's a Terry stop. That seems to be what the case law suggests, yes, that there is a seizure, but it's not custody for Miranda. That's the distinction that Glenda Gallegos made, and that's the distinction that's made in the case law. I agree it doesn't always make great sense. What about Craig Hitt? Pardon? What about Craig Hitt? What do you say about that case? If I remember correct, that's the case of the person found in his home. But there were agents from several different agencies. They put him in a room and blocked the entrance. And so he was in custody in the sense that he, because of the way it was done, put him in a particular situation. Well, what it says is you consider whether the suspect was isolated from others. Isolation from the outside world is perhaps a crucial factor. And the explanation is that there aren't people there to witness it. In the case, whatever it was, where there were 15 people who ran away, they said, well, there were 14, 15 other witnesses. Here, this person behind the garbage can is isolated from the world. There are no witnesses to see. He's there with one person. And under one view of these cases, now, I'm not saying you can get a consistent, logical answer to this. But under one view is if you're isolated from what other people can see and you're there with one officer, you're not free to leave. Seriously, you're not free to leave here. This guy couldn't have gotten up and said, well, so long, officer. I'm going to go on my way. There's no chance he could have done that. It seems to me there's a lot in Craikhead to suggest that this is custody. Well, Your Honor, I would strongly disagree that he was alone here. This is in the middle of an apartment complex. He's in the middle of an apartment complex surrounded by two-story buildings. It's so well lit, he doesn't even need his flashlight, according to the agent. So those things that some of the cases say they're worried about, could he be beaten and stuff, he's right outside the apartment complex. Many, many apartment complexes. Anything that's going to happen is going to wake people up. There are probably still people awake. This is a very public area. It couldn't be more public. But we're not talking about it being isolated in the sense that you could be beaten up. It was 2.30 in the morning, right? Yes, it was 2.30. So even though it's lit up, it's 2.30 in the morning. I mean, was there any evidence that there was anybody else around that there were lights on or anything like that? Well, there were certainly lights. This was a condo. In the apartment buildings. No, there's no evidence of that. Certainly, I mean, this is in the middle of an apartment complex. This isn't out in the desert. This isn't along a lone highway. This is a heavily residential area. It's immediately next to the border, what they call a heavy residential area. That's on 28 of the supplemental excerpts of record. He talks about how this is in the middle of the old projects. These are two-story apartment buildings. This couldn't be more public. The time of day doesn't make it non-public. No, I don't know. I mean, looking at the testimonies, the agent says this is like the corner of the house. They have big garbage cans, recycling garbage and whatnot. I'm running eastbound. I see an individual squatting, kind of concealing themselves like a baseball catcher. So he's in this little area where there's garbage cans. It's 2.30 in the morning, and he's squatting behind him. I don't know how you can say it couldn't be more public. Seriously. Well, because he's just next to the building where there are other buildings all around. It's not like he's hidden. I mean, yes, there's some garbage cans here. But this, I mean, I would just, I guess that would be my characterization of it. And I would just say, I mean, yes, they're not free to leave in the sense that it's a seizure, but it's different than custody. And the case all makes it clear where there's reasonable suspicion the officer can ask those questions. Thank you. We'll give you a few minutes. Thank you, Your Honor. On the custody issue, getting to the last point about whether it was well lit, not in the desert, some additional facts were that the agent, the Border Patrol agent, said that it was quiet at nighttime in general in this particular complex, and that's on ER 37. He also said that when he was in pursuit of Mr. Gonzalez, he said, quote, I didn't see anybody else. That's SCR 43. So it couldn't have been more isolated and more non-public at that point of night. So whether it's lit or not, outside or in the actual area is irrelevant. There's no testimony whatsoever that this was viewed by anyone other than the agent himself. Moreover, the agent did not inform Gonzalez that he was free to leave. And I believe that, Judge Reinhart, your focus on Craighead is the right approach in this case to answer the difficult question of how this is different from the Terry stuff. Craighead calls for Miranda, and it says – and it may be the case that it tries to make the most sense out of this, but I'm not certain that the sense it makes out of it is helpful to you. It says that it was – the key was it was incommunicado interrogation of individuals in a police-dominated atmosphere, cut off from the outside world. Do you think that the facts here – I mean, the notion being somebody who was isolated and surrounded by police, isolated, you know, essentially from where – well, go ahead. What do you think about the characterization here? Was he incommunicado? I think so. I don't think it's as strong as the facts in Craighead on that particular factor, which is the degree of isolation. But I think there's enough in this case. Well, Craighead, he was isolated in his own home. He wasn't away from society. Right. Right. And, again, it's a balancing test of four factors. Well, other people in the house, it was just that he was isolated in a room. Right. And he also was not informed that he was – Mr. Gonzales was not informed that he was free to leave for the reasons of isolation that we just talked about. That is, as the Supreme Court and this Court has said, is the crucial factor in determining the degree of isolation. In none of these cases did the police say you're free to leave. That's a factor for instances you get from the circumstances. It is a factor, Your Honor, though. It's one that's in this Court's precedent, and it's taken from Thompson v. Keoughhane's Supreme Court case, and so it is relevant. It might be the weakest of the four. It would be nice if they said you're free to leave, but that's rarely, if ever, done. Sure. Sure. But it's still a factor, Your Honor, and it's something to consider. And just the last quick point about I wanted to correct the record. Opposing counsel said that they did lose him for a second, but the government conceded in its response brief that Mr. Gonzales was under official restraint during the entire time and, therefore, can't make that argument here. And finally, with regard to legal impossibility versus factual impossibility, our argument is based on legal impossibility. McCormack, a Ninth Circuit case from 1995, defines legal impossibility as It doesn't matter because we have a controlling precedent. It just doesn't matter. Well, Your Honor, we don't think it's controlling. We think that there's factual and legal distinguishing grounds in that case. The court there asked a different question than the court we're asking today. Thank you, counsel. Thank you. Please take care of your release of witness. Thank you both. It was an interesting argument.
judges: Kennelly, Reinhardt, Berzon